UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELGIN JOHNSON, ) | | |
| ) | | |
| Plaintiff, ) | | |
| v. ) | CIVIL ACTION | |
| ) | NO. 11-40210-TSH | |
| MICHAEL J. ASTRUE, Commissioner ) | | |
| of Social Security, ) | | |
| ) | | |
| Defendant. ) | | |

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS REGARDING
<u>DENIAL OF SOCIAL SECURITY BENEFITS</u>**

May 6, 2013

DEIN, U.S.M.J.

## I.  <u>INTRODUCTION</u>

Plaintiff Elgin Johnson ("Johnson") has brought this action, pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. § 405(g) and 1383(c)(3), in

order to challenge the final decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying his claim for Social Security Disability

Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits.  The matter is

presently before the court on the "Plaintiff's Motion to Reverse" (Docket No. 12), by

which the plaintiff is seeking an order vacating the Commissioner's decision and

remanding the matter to the Social Security Administration for further administrative

proceedings.  It is also before the court on the "Defendant's Motion to Affirm the

Commissioner's Decision" (Docket No. 14), by which the Commissioner is seeking an order affirming his decision to deny Johnson's claim for benefits.  At issue is whether the Administrative Law Judge ("ALJ"), in reaching her decision that Johnson was not disabled, rendered an assessment of Johnson's residual functional capacity that was inconsistent with the medical evidence, and conducted an inadequate evaluation of Johnson's credibility regarding his subjective complaints of pain and other symptoms. Also at issue is whether the ALJ committed reversible error by relying on the testimony of a vocational expert whose opinions were unreliable.

As described below, this court finds that while the plaintiff's other arguments are unpersuasive, the ALJ's finding that Johnson retained the mental residual functional capacity to handle detailed instructions and to occasionally handle complex instructions, and her inclusion of that finding in her hypothetical question to the vocational expert, was not based on substantial evidence in the record.  Accordingly, and for all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Commissioner's motion to affirm be DENIED, that the plaintiff's motion to reverse be ALLOWED, and that the matter be remanded to the ALJ for further proceedings consistent with this Report and Recommendation.

## II.  <u>STATEMENT OF FACTS</u>[1]

Johnson was born on July 7, 1970, and was 40 years old at the time of his hearing

before the ALJ.  (Tr. 55, 225).  He has a high school education and has held a variety of

jobs, most of which involved heavy lifting.  (<u>See</u> Tr. 55-59).  Specifically, during the time

period between 1997 and 2007, Johnson performed work as a packer and loader for a

distribution company, a manager at a Target store, and a mover at a moving company.

(Tr. 55-56).  Additionally, he briefly held jobs loading trailers for a distribution company

and repossessing cable boxes for a communications company.  (Tr. 57-60).

In January 2005, while Johnson was working as a mover, the plaintiff injured his

neck as he attempted to lift a refrigerator.  (Tr. 56, 367).  Although he continued to

perform work over the course of the two years following this incident, he claims that

debilitating pain and mental health issues stemming from his 2005 neck injury have

prevented him from working since he left his last job at the end of December 2007.  (<u>See</u>

Tr. 52-54, 248, 265).

### <u>Procedural History</u>

Johnson filed applications for SSI and SSDI benefits on October 29, 2008,

claiming that he had been unable to work since January 1, 2008 due to depression and

pain in his shoulders, neck and back.  (Tr. 225-35, 243, 248, 265).  His applications were

---

[1]  References to pages in the transcript of the record proceedings shall be cited as "Tr. __."  The ALJ's decision shall be cited as "Dec." and can be found beginning at Tr. 8.

denied initially on March 18, 2009, and upon reconsideration on October 8, 2009.  (Tr. 115-18, 126-31).

The plaintiff subsequently requested and was granted a hearing before an ALJ, which took place on October 26, 2010.  (Tr. 47-107, 132-33).  Johnson, who was represented by counsel, appeared and testified at the hearing.  (Tr. 54-72).  In addition, the ALJ elicited testimony from a vocational expert ("VE"), who responded to hypothetical questions designed to determine whether jobs exist in the national economy for an individual with the same age, educational background, past work experience, and residual functional capacity ("RFC") as the plaintiff.  (See Dec. 19-20, Tr. 26-27; Tr. 72-103). Johnson contends that the VE's testimony was unreliable because the hypothetical questions that were posed to her by the ALJ contained an inaccurate description of the plaintiff's RFC, and because the VE's responses to the hypothetical questions regarding work existing in the national economy were inconsistent with the occupations described in the Dictionary of Occupational Titles ("DOT") issued by the Department of Labor.[2] As detailed below, this court finds that the ALJ's description of the plaintiff's mental RFC was not based on substantial evidence and rendered the VE's testimony unreliable. However, any inconsistencies between the VE's testimony and the DOT did not undermine the reliability of her testimony.

---

[2]  The Social Security Administration takes administrative notice of "reliable job information" set forth in the DOT.  See 20 C.F.R. §§ 404.1566(d) and 416.966(d).

Significantly, in the first hypothetical, the ALJ described an individual who retains the physical RFC to perform light work, except that the individual can only occasionally push, pull or operate foot pedals, can only occasionally perform "posturals,"[3] should have no exposure to heights or use of ladders, ropes, or scaffolds, can perform only occasional overhead reaching, cannot perform overhead lifting of anything over 5 pounds, and should avoid heavy machinery. (Tr. 74-77). Additionally, with respect to the individual's mental limitations, the ALJ stated that the hypothetical individual "can perform simple and detailed instructions, but only occasionally complex instructions[,]" "[c]an concentrate up to two hours at a time before needing a normal break[,]" "can adjust to simple routine changes in the workplace[,]" has no limits on social functioning, and should perform no production-paced work. (Tr. 77). The ALJ then asked the VE whether or not there were any jobs that such an individual could perform, and the VE testified that a claimant with those limitations would be able to perform the work of an information clerk, a desk attendant security guard, and an inspector. (Tr. 77-78). She also testified that each of those jobs would be considered light work having a specific vocational preparation ("SVP") level of 2.[4]  (Id.). Moreover, the VE explained that her

---

[3] It appears that by "posturals," the ALJ was referring to the ability to balance, stoop, kneel, crouch, or crawl. (See Dec. Finding #5, Tr. 17; Tr. 376). The plaintiff does not dispute that the VE understood what the ALJ meant by the use of that term in her hypothetical question.

[4] "The DOT defines 'specific vocational preparation' as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" Ahearn v. Astrue, No. 06-94-B-W, 2007 WL 951562, at *2 (D. Me. Mar. 27, 2007) (quoting Appendix C, § II to

testimony was based on her experience, her observations of the jobs, and labor market surveys.  (Tr. 78).  The ALJ ultimately relied on the VE's response to the first hypothetical to support her determination that Johnson was not disabled.  (See Dec. 10, 19-22, Tr. 17, 26-29).

After the ALJ asked the VE some additional hypothetical questions, the plaintiff's counsel was given an opportunity to examine the VE.  (See Tr. 79-83).  Notably, during her questioning, the plaintiff's counsel challenged the VE's testimony on the grounds that each of the jobs she listed requires frequent reaching.  (Tr. 81).  The VE explained that according to the DOT, those jobs do require frequent reaching.  (Id.).  However, she stated that the DOT, which was written in 1991, is outdated and does not describe the positions as they are performed today.  (Id.).  She also reiterated that her testimony was based on her own observations and labor market research, and she gave examples of instances in which she had seen individuals performing the jobs she identified under conditions requiring only occasional overhead reaching.  (Tr. 81-82).

Upon further questioning by the ALJ, the VE testified that she has worked in the vocational field for over 25 years, and has worked with disabled people throughout that entire time period.  (Tr. 90-91).  She also explained that she routinely researches the labor

---

the DOT), aff'd, 2007 WL 1309557 (D. Me. May 2, 2007).  SVP Level 2 corresponds to unskilled work.  Id. See also Social Security Ruling 00-4P, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000) ("Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT").

market in order to place people in jobs, and that in connection with this work, she identifies where jobs exist and determines the requirements of the jobs at issue, including the character and nature of those jobs. (See Tr. 91-93). Furthermore, the VE stated that she recently performed labor market surveys on each of the three jobs that she identified in response to the ALJ's hypothetical question. (Tr. 95). However, when asked by the plaintiff's counsel to produce copies of those surveys, the VE refused on the grounds that they contained confidential information concerning individuals. (Tr. 82). The plaintiff asserts that the VE's refusal to produce the labor market surveys unfairly deprived him of an opportunity to test the reliability of the VE's testimony.

The plaintiff's counsel also objected to the VE's testimony on the grounds that the reasoning levels required for the jobs she identified exceed the reasoning level needed for simple work. (Tr. 98-99). In response to counsel's objection, the ALJ asked the VE to change the mental limitations contained in her first hypothetical question so that instead of using "simple, detailed, and occasional [complex] instructions," the hypothetical claimant would be restricted to "unskilled work." (Tr. 100-01). The VE testified that even under those circumstances, the claimant would remain capable of performing work as an information clerk, desk attendant security guard, and inspector. (See id.).

The ALJ attempted to schedule a second hearing on May 20, 2011. (Tr. 207-12, 314-15). However, the plaintiff objected and the ALJ agreed to cancel the hearing and issue a decision based on the record before her. (Tr. 224, 314-15). On May 26, 2011, the ALJ issued her written decision denying Johnson's application for benefits. (Tr. 5-30).

**The ALJ's Decision**

The ALJ concluded that from January 1, 2008 through the date of her decision on May 26, 2011, Johnson had not been "under a disability, as defined in the Social Security Act," which defines "disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." (Dec. 2 and Finding #11, Tr. 9, 29).  See also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  There is no dispute that the ALJ, in reaching her decision, applied the five-step sequential evaluation required by 20 C.F.R. §§ 404.1520 and 416.920.  The procedure resulted in the following analysis, which is detailed in the ALJ's "Findings of Fact and Conclusions of Law."  (See Dec. 4-22, Tr. 11-29).

The first inquiry in the five-step process is whether the claimant is "engaged in substantial gainful work activity[.]"  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  If so, the claimant is automatically considered not disabled and the application for benefits is denied.  See id.  In the instant case, the ALJ noted that in October 2008, the plaintiff reported to his doctor that he had injured his back "lifting heavy objects *while still working for a moving company*[,]" and in August 2009, he told his doctor that "he had spent the last 7 months working as a cab driver, working on average 10-12 hour shifts[,]" but had failed to disclose that information at the hearing or in any of the materials he submitted to the Social Security Administration.  (Dec. 4-5, 12, Tr. 11-12, 19 (citations

omitted; emphasis in original)).  Nevertheless, because the ALJ determined that she lacked sufficient evidence to support a finding that Johnson had actually engaged in substantial gainful activity since January 1, 2008, the alleged onset date of his disability, the ALJ found that he had not done so, and she proceeded to the next step in the analysis. (Dec. Finding #1, Tr. 11).

The second inquiry is whether the plaintiff has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is considered not disabled and the application for benefits is denied.  See Seavey, 276 F.3d at 5.  Here, the ALJ concluded that Johnson suffered from the severe impairments of degenerative disc disease, mood disorder and depression.  (Dec. Finding #3, Tr. 12).

In connection with her finding at step two, the ALJ provided a detailed description of the medical records relating to Johnson's physical and mental health conditions.  (Dec. 5-9; Tr. 12-16).  Although the ALJ considered medical evidence dating back to the time of Johnson's neck injury in 2005 (see Dec. 5; Tr. 12), her discussion focused on medical records covering the time period from January 2008 through February 2011, when Johnson claimed he was disabled from working.  (See Dec. 5-9; Tr. 12-16).  In particular, the ALJ provided details regarding Johnson's treatment for chronic neck pain and mental health issues, as well as for back pain and other, more minor complaints.  (See id.).  She also highlighted evidence from the record which was inconsistent with the plaintiff's

claim of disability, including evidence that Johnson had worked as a mover and a cab driver, participated in recreational activities such as "cliff diving" 30 feet into the ocean, and engaged in sports such as swimming.  (See Dec. 5-7; Tr. 12-14).  Ultimately, however, the ALJ credited medical evidence showing that during the relevant time period, Johnson suffered from degenerative disc disease, mood disorder and depression, and she concluded that those conditions were "severe" within the meaning of the applicable regulations.  Accordingly, she proceeded to step three in the sequential analysis.

The third inquiry is whether the claimant has an impairment equivalent to a specific list of impairments contained in Appendix 1 of the Social Security regulations, in which case the claimant would automatically be found disabled.  See Seavey, 276 F.3d at 5; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At this step, the ALJ concluded that Johnson's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments.  (Dec. Finding #4, Tr. 16).  While the plaintiff does not challenge this conclusion, the parties dispute the significance of the ALJ's finding at this stage that Johnson had moderate limitations in concentration, persistence, or pace.

Significantly, in reaching her conclusion at step three, the ALJ considered whether Johnson's mood disorder and depression met or medically equaled the criteria of Listing 12.04 for affective disorders.  (Dec. 9, Tr. 16).  See also 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.  The ALJ determined that the severity of those impairments did not meet the relevant Listing because there was no evidence to establish the presence of so-called "paragraph C" criteria, and because the plaintiff's impairments did not satisfy the so-

called "paragraph B" criteria, which require at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation.  (See Dec. 9-10; Tr. 16-17).  With respect to the paragraph B criteria, the ALJ found that the plaintiff had only mild difficulties in the areas of social functioning and activities of daily living, and no episodes of decompensation.  (Id.). However, she determined that he had "moderate" difficulties with regard to concentration, persistence, or pace.  (See Dec. 10; Tr. 17).  As detailed below, the parties dispute whether the ALJ adequately accounted for those moderate limitations in connection with her finding regarding the plaintiff's mental RFC.

Because the ALJ determined at step three that Johnson's impairments did not meet or equal any of the listed impairments, her analysis continued.  The fourth inquiry asks whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work[.]"  Seavey, 276 F.3d at 5.  Accordingly, it was at this stage in the procedure that the ALJ determined Johnson's RFC.  Specifically, the ALJ determined as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no more than occasional push/pull; no more than occasional foot pedals; no exposure to heights through the use of ropes, ladders, or scaffolds; no more than occasional balancing, stooping, kneeling, crouching, or crawling; no overhead lifting of anything over 5 pounds in weight; no more than occasional overhead reaching; avoid operation of heavy machinery; avoid concentrated

> exposure to respiratory irritants; <u>can handle simple and detailed
> instructions, but can only occasionally handle complex instructions;
> can concentrate for two hours at a time before needing a break</u>; can
> adjust to simple, routine changes in the work place; <u>and no
> production paced work</u>.

(Dec. Finding #5, Tr. 17 (emphasis added)).  Johnson contends that this finding is not

supported by substantial evidence because the ALJ failed to properly account for the

moderate limitations in his ability to maintain concentration, persistence or pace.

Additionally, he asserts that in connection with her RFC determination, the ALJ

conducted an inadequate assessment of Johnson's credibility regarding his subjective

complaints of pain and other symptoms, and improperly relied on outdated opinion

evidence concerning Johnson's physical RFC.

<u>Details Regarding the ALJ's Credibility Assessment</u>

In reaching her conclusion regarding Johnson's RFC, the ALJ found "the

[plaintiff] to have one of the lowest assessments of credibility [she had] made in a case to

date."  (Dec. 12; Tr. 19).  As the ALJ stated,

> Not only does the record indicate the claimant engaged in work
> activity subsequent to the alleged onset date (and did not disclose
> this at any point to the Administration; including his sworn
> testimony at the hearing), there is inconsistent reporting of his
> history regarding alcohol and nicotine use.  Further, the claimant
> engaged in drug seeking behavior at several points in the record,
> leading the undersigned to question his reports of pain as a means to
> obtain narcotics versus actual physical discomfort.  Lastly, the
> overall chronology of claimant's pain and limitations just does not
> make sense in relation to his grounds for seeking disability.

(<u>Id.</u>).

The ALJ then proceeded to describe the evidence on which she relied in support of her credibility assessment.  For example but without limitation, in order to support her conclusion that Johnson engaged in drug seeking behavior, the ALJ described an incident in which Johnson was found to have stolen a prescription slip from his physician, which he then used to write himself a prescription for Percocet.  (Id.; see also Tr. 587).  She also provided examples of Johnson's efforts to obtain narcotics from different providers after his treating physician stopped prescribing them, and she described an incident in which the plaintiff attempted to obtain narcotics by claiming that his medication had been stolen three days after it had been prescribed.  (Dec. 12-13; Tr. 19-20).

The ALJ also provided examples from the record which illustrated inconsistencies in Johnson's reporting of his alcohol use to his medical providers, and she provided a chronology of Johnson's records in which she highlighted significant gaps in treatment and in Johnson's complaints of pain.  (Dec. 13-16; Tr. 20-23).  Moreover, the ALJ pointed out that during his alleged period of disability, Johnson not only engaged in work-related activities, but also engaged in such physical activities as basketball, "cliff diving," jet skiing, and operating an off-road vehicle.  (Dec. 12, 14; Tr. 19, 21).  The plaintiff does not dispute that such evidence is contained in the record.

The ALJ acknowledged that beginning in August 2009, Johnson consistently complained of neck pain and radicular pain in his left arm and shoulder, although she noted that he continued to work out at the gym and participate in sports.  (Dec. 14-15; Tr. 21-22).  She also acknowledged that the plaintiff underwent surgery on his neck in

-13-

December 2009, and again in January 2010 after he fell and damaged the hardware that had been placed in his neck during the first surgery.  (Dec. 6-7; Tr. 13-14).  The ALJ found, however, that the plaintiff's neck impairment was fully resolved by September 2010.  (Dec. 15-16; Tr. 22-23).  Furthermore, she concluded that his subsequent complaints of neck pain in February 2011 were not credible in light of the plaintiff's overall lack of credibility and evidence from September 2010 showing that his neck condition had been resolved.  (Dec. 15-16; Tr. 22-23).

With respect to the plaintiff's alleged mental impairments, the ALJ determined that there were inconsistencies in the record which undermined Johnson's statements regarding the extent of his mental limitations.  (Dec. 16; Tr. 23).  For instance, but again without limitation, the ALJ noted that Johnson reported a history of physical abuse by his stepfather to one mental health provider, but made no mention of it to others.  (Id.).  Moreover, in August 2009, the plaintiff told a clinician that he had a good relationship with his father, but later reported that he did not know his biological father.  (Id.).

Significantly, the ALJ found that the most consistent problems involving Johnson's mental health "appear to be distraction, difficulty focusing and mood swings." (Id.).  She explained that as a result of these limitations, she included a two-hour limitation on Johnson's ability to maintain concentration, persistence, and pace in her RFC assessment, and limited the plaintiff to simple, detailed, and occasionally complex instructions.  (Id.).  Furthermore, she explained that she limited the plaintiff "to simple routine changes to avoid becoming frustrated at having to constantly learn new processes

or deal with constant upheaval in the workplace[,]" and that she "eliminated production pace work so the claimant would not feel stress or agitation in being required to meet quotas, and likely cause a mood swing or increase his irritability."  (Id.).  However, the ALJ determined that the record did not support further limitations regarding Johnson's mental impairments.  (Id.).

Consideration of Opinion Evidence

The ALJ described the opinion evidence that she had considered in determining Johnson's RFC, as well as the weight that she had given to the assessments of the various physicians and mental health professionals who had examined the plaintiff or provided opinions based on a review of Johnson's medical records.  (Dec. 17-18; Tr. 24-25).  With respect to the plaintiff's physical impairments, the ALJ explained that she was giving the greatest weight to the opinion of Dr. Malin Weeratne, a state agency physician who had reviewed the plaintiff's medical records and completed a physical RFC form on June 22, 2009.  (Dec. 17; Tr. 24; see also Tr. 416-23).  The ALJ stated that she used Dr. Weeratne's RFC assessment as a template for Johnson's physical limitations, but added further restrictions on Johnson's postural limitations in order "to give the claimant a benefit of the doubt and address his lumbar spine complaints which developed subsequent to Dr. Weeratne's evaluation."  (Dec. 17; Tr. 24).  She further explained that she had gone beyond Dr. Weeratne's opinion by eliminating any climbing of ropes or exposure to heights, and by expanding the limitations on Johnson's overhead work "to put the least amount of strain on his reportedly severely impaired neck and shoulders."  (Id.).

The ALJ also stated that she was giving some weight to the opinion of Dr. Leslie Caraceni, a state agency physician who had reviewed the plaintiff's medical records and completed a physical RFC form on March 3, 2009. (Id.; see also Tr. 374-81). However, the ALJ stated that she was giving less weight to Dr. Caraceni's opinion than to Dr. Weeratne's opinion because Dr. Caraceni had issued her opinion at an earlier point in time when there was less medical evidence available for review. (Dec. 17; Tr. 24).

The ALJ noted that none of Johnson's treating sources provided opinions regarding the plaintiff's physical RFC, but she found that there was some evidence from the plaintiff's surgeon, Dr. Eck, which could be considered opinion evidence. (Id.). The ALJ reviewed that evidence and credited records from Dr. Eck indicating that the plaintiff's neck symptoms resolved within fewer than 12 months following his second neck surgery. (Id.). As indicated above, that surgery occurred in January 2010. (See Tr. 465).

With respect to the plaintiff's mental impairments, the ALJ stated that she was giving controlling weight to the opinion of Dr. Orrin Blaisdell, a state agency consultant who had completed a Psychiatric Review Technique form ("PRTF") and conducted the only mental RFC assessment in the record. (Dec. 17; Tr. 24; see also Tr. 386-403). The ALJ explained that she was adopting Dr. Blaisdell's findings as to the paragraph "B" criteria, and that she was accounting for Dr. Blaisdell's assessment that Johnson had lapses in pace by eliminating production paced work. (Dec. 17; Tr. 24). However, the ALJ explicitly rejected Dr. Blaisdell's opinion that Johnson should be limited to simple 1-2 step instructions. (Id.). Instead, she found that "while the claimant does have issues

with concentration, persistence, and pace, there is nothing in the overall record to indicate he could not handle more detailed instructions." (Id.).  For the reasons set forth herein, this court finds that the ALJ improperly based her conclusion that Johnson could handle detailed instructions on her own interpretation of the medical evidence rather than on the opinion of an expert.

The ALJ also gave considerable weight to the opinion of Eva Snyder, a licensed clinical psychologist, and nearly equal weight to the opinion of Dr. Martin Hart, in connection with her assessment of Johnson's mental RFC.  (Dec. 18; Tr. 25).  Dr. Snyder had conducted a psycho-diagnostic interview of the plaintiff on March 10, 2009 and assessed Johnson as having a Global Assessment of Functioning ("GAF") score of 62-64, which indicates mild symptoms.  (Dec. 18; Tr. 25; see also  Tr. 382-84).  Dr. Hart had conducted a diagnostic evaluation of the plaintiff on October 13, 2009.  (Tr. 611-13).  Although he did not provide a GAF score, Dr. Hart's evaluation indicated that the plaintiff had problems with distraction and poor concentration.  (Dec. 18; Tr. 25; see also Tr. 611-12).

The ALJ gave little weight to the opinion of Pat Senior, an intake clinician at Prescott Health Care, and to the opinion of a clinician at Arbour Counseling who had completed an initial clinical evaluation of the plaintiff.  (Dec. 18; Tr. 25; see also Tr. 411-15, 605-08).  The ALJ determined that those individuals are not considered acceptable sources by the Social Security Administration, and that their opinions were not supported by the opinion of an acceptable medical source.  (Dec. 18; Tr. 25).

-17-

After explaining the basis for her RFC determination, the ALJ concluded that Johnson was unable to perform his past relevant work as a furniture mover, packer or department store manager.  (Dec. Finding #6; Tr. 26).  Consequently, the ALJ reached the fifth and last step in the sequential analysis.

The fifth inquiry is whether, given the claimant's RFC, education, work experience and age, the claimant is capable of performing other work.  See Seavey, 276 F.3d at 5; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g).  At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Seavey, 276 F.3d at 5.  Here, the ALJ determined that there was no basis to disregard the testimony of the VE that an individual with Johnson's age, education, work experience and RFC would have the ability to perform work as an information clerk, a security guard desk attendant or an inspector.  (Dec. 20; Tr. 27). Although the ALJ acknowledged that the VE's testimony was not entirely consistent with the DOT, she found that the VE had given a sufficient explanation for any such inconsistencies and provided an adequate basis for her conclusion that the listed jobs were consistent with the plaintiff's RFC.  (Dec. 22; Tr. 29).  The ALJ also emphasized that the VE had relied on her own experience and labor market surveys in rendering her opinions, and she noted that the plaintiff's counsel had not objected to the VE's qualifications. (Dec. 20; Tr. 27).  Furthermore, the ALJ determined, in relevant part, that the VE was not obligated to provide plaintiff's counsel with copies of her labor market surveys.  (Dec.

-18-

21; Tr. 28). Accordingly, she relied on the VE's testimony to find that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy[,]" and to conclude that Johnson was not disabled. (Dec. 22; Tr. 29).

The plaintiff appealed the ALJ's decision, and on September 13, 2011, the Appeals Council denied his request for review. (Tr. 1-3). Accordingly, the plaintiff has exhausted all of his administrative remedies, and the case is ripe for review by this court pursuant to 42 U.S.C. § 405(g).

Additional factual details relevant to this court's analysis are described below where appropriate.

### III. ANALYSIS

#### A. Standard of Review

Johnson is seeking judicial review of the Commissioner's "final decision" pursuant to the Social Security Act § 205(g), 42 U.S.C. § 405(g) (the "Act"). The Act provides in relevant part that:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action .... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by *substantial evidence*, shall be conclusive ....

42 U.S.C. § 405(g) (emphasis added).  The Supreme Court has defined "substantial

evidence" to mean "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  <u>Richardson

v.Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting

<u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126

(1938)); <u>accord</u> <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st

Cir. 1991).

It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in
> mind that "issues of credibility and the drawing of permissible
> inference from evidentiary facts are the prime responsibility of the
> [Commissioner]."  The [Commissioner] may (and, under his
> regulations, must) take medical evidence.  But the resolution of
> conflicts in the evidence and the determination of the ultimate
> question of disability is for him, not for the doctors or for the courts.
> We must uphold the [Commissioner's] findings in this case if a
> reasonable mind, reviewing the record as a whole, could accept it as
> adequate to support his conclusion.

<u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981) (quoting

<u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)).  Thus,

"the court's function is a narrow one limited to determining whether there is substantial

evidence to support the [Commissioner's] findings and whether the decision conformed

to statutory requirements."  <u>Geoffroy v. Sec'y of Health & Human Servs.</u>, 663 F.2d 315,

319 (1st Cir. 1981).  The Commissioner's decision must be affirmed, "even if the record

arguably could justify a different conclusion, so long as it is supported by substantial

evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir.

1987).

"Even in the presence of substantial evidence, however, the Court may review

conclusions of law, and invalidate findings of fact that are 'derived by ignoring evidence,

misapplying the law, or judging matters entrusted to experts[.]'" Musto v. Halter, 135 F.

Supp. 2d 220, 225 (D. Mass. 2001) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.

1999) (per curiam)) (internal citations omitted).  "Thus, if the ALJ made a legal or factual

error, the court may reverse or remand such decision to consider new, material evidence

or to apply the correct legal standard." Ross v. Astrue, Civil Action No. 09-11392-DJC,

2011 WL 2110217, at *2 (D. Mass. May 26, 2011) (internal citation omitted).

### B.   Adequacy of the RFC Assessment

The plaintiff argues that the Commissioner's decision to deny his claim for SSI

and SSDI benefits must be reversed because the ALJ's assessment of Johnson's mental

and physical RFC was not supported by substantial evidence in the record.  (See  Pl. Mot.

(Docket No. 12) at 4-6, 11).  For the reasons that follow, this court finds that the ALJ's

finding as to the plaintiff's physical RFC was appropriate, but that the ALJ erred in

connection with her finding regarding Johnson's mental RFC.

### The Mental RFC Assessment

Johnson contends that the ALJ improperly assessed his mental RFC because she

failed to account for his moderate limitations in concentration, persistence or pace, and

because her conclusion that he was capable of handling simple and detailed instructions,

as well as occasional complex instructions, was inconsistent with the medical evidence and reflected her lay interpretation of the record.  (Id. at 4-6).  Although the record shows that the ALJ expressly considered Johnson's moderate mental impairments, and attempted to account for them in her finding as to Johnson's mental RFC, this court agrees that the ALJ's determination that Johnson retained the mental ability to handle detailed and occasionally complex instructions was inappropriate and requires a remand of this matter to the Commissioner.

        As described above, the ALJ gave controlling weight to the opinion Dr. Blaisdell in connection with her assessment of Johnson's mental RFC.  (Dec. 17; Tr. 24).  On March 17, 2009, Dr. Blaisdell completed a PRTF in which he rated the degree of the plaintiff's limitations in his activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace.  (Tr. 386-98).  Dr. Blaisdell concluded that Johnson had "mild" limitations in the first two areas of functioning, but "moderate" limitations in maintaining concentration, persistence, or pace.  (Tr. 396).  The ALJ expressly adopted these findings in connection with her determination that Johnson's mental impairments did not meet or medically equal a listed impairment at step three in her analysis.  (See Dec. 9-10, 17; Tr. 16-17, 24).  Thus, she specifically found that Johnson had moderate limitations in his ability to maintain concentration, persistence, or pace.  (Dec. 10; Tr. 17).

        In addition to completing a PRTF, Dr. Blaisdell completed a written mental RFC assessment form for the plaintiff on March 17, 2009.  (Tr. 400-03).  Therein, Dr.

-22-

Blaisdell checked off boxes indicating that Johnson was "moderately limited" in two out of eight areas of concentration, persistence and pace. (Tr. 400-01). He also provided a narrative statement in which he translated his findings into a specific assessment of Johnson's mental RFC. (Tr. 402). Specifically, Dr. Blaisdell opined that Johnson would be "[a]ble to learn simple one and two step tasks[,]" would be "[a]ble to carry out tasks in a normal time frame, though there may be occasional lapses due to depression[,]" and that Johnson's depression would interfere with social activities, but that he would remain "capable of appropriate social interaction." (Id.). Furthermore, he opined that Johnson would have no limitations in the area of adaptation. (Id.).

The record shows that the ALJ made an effort to incorporate Johnson's moderate limitations in concentration, persistence or pace into her finding regarding the plaintiff's mental RFC. In particular, the ALJ expressly stated that she was accounting "for [Dr. Blaisdell's] observation of the claimant having lapses in pace by eliminating production paced work." (Dec. 17; Tr. 24). Additionally, the ALJ stated that in order to account for evidence in the record showing that Johnson suffered from "distraction, difficulty focusing and mood swings[,]" she was limiting him to "two (2) hours in his concen-tration, persistence, and pace[,]" and limiting him "to simple and detailed instructions (and on occasion, complex)." (Dec. 16; Tr. 23). Furthermore, the ALJ explained that she had limited Johnson to "simple routine changes" so that he would not become "frustrated at having to constantly learn new processes or deal with constant upheaval in the workplace." (Id.). Thus, to the extent the plaintiff claims that the ALJ erred by simply

ignoring Johnson's moderate mental limitations in her RFC finding, his argument is not persuasive.

However, this court finds that the ALJ committed error in connection with her finding that the plaintiff retained the mental capacity to handle detailed instructions and occasionally handle complex instructions.  (See Dec. Finding #5; Tr. 17).  As described above, Dr. Blaisdell provided the only mental RFC assessment in the record, and he opined that the plaintiff would be limited to "simple one and two step tasks."  (Tr. 402).  Moreover, on October 6, 2009, Lawrence Langer, Ph.D., reviewed the medical evidence regarding Johnson's mental impairments and endorsed Dr. Blaisdell's assessments.  (Tr. 424).  Nevertheless, the ALJ specifically rejected Dr. Blaisdell's determination that Johnson was limited to 1-2 step tasks.  As the ALJ explained in her written decision, "[t]he undersigned does not agree with limiting the claimant only to simple 1-2 step instructions because while the claimant does have issues with concentration, persistence, and pace, there is nothing in the overall record to indicate he could not handle more detailed instructions."  (Dec. 17; Tr. 24).  Accordingly, she determined that Johnson retained the ability to handle detailed and occasionally complex instructions as well as simple instructions.  (Dec. Finding #5; Tr. 17).

The ALJ did not point to any specific evidence in the record that conflicted with Dr. Blaisdell's opinion or otherwise undermined his assessment of Johnson's mental RFC.  However, an ALJ "[is] not at liberty to ignore medical evidence or substitute [her] own views for uncontroverted medical opinion."  Nguyen, 172 F.3d at 35.  Furthermore,

"[s]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 430 (1st Cir. 1991). See also Nguyen, 172 F.3d at 35 (explaining that an ALJ is "simply not qualified to interpret raw medical data in functional terms"). In the instant case, the ALJ substituted her own views for Dr. Blaisdell's uncontroverted opinion that Johnson should be limited to 1-2 step tasks by rejecting his opinion and finding that Johnson could handle detailed and occasionally complex instructions. Because that finding was based on nothing more than impermissible lay opinion, Johnson's motion to reverse and remand the matter to the Social Security Administration should be allowed.

The Commissioner argues that the ALJ's mental RFC assessment was proper because she eliminated production paced work and found that Johnson had the capacity to work in two-hour segments before needing a break.  (Def. Mem. (Docket No. 15) at 14-15).  This argument does not address the fundamental flaw in the ALJ's decision.  As described above, the ALJ eliminated production paced work in order to account for Dr. Blaisdell's opinion that Johnson would have occasional lapses in pace due to depression. (Dec. 17; Tr. 24; see also Tr. 402).  However, she specifically rejected his opinion that Johnson would be limited to simple 1-2 step tasks and did not incorporate that restriction into her finding regarding Johnson's mental RFC.  Although the ALJ's decision to limit Johnson's work to two-hour segments was intended to address the plaintiff's limitations

in the area of concentration (<u>see</u> Dec. 16; Tr. 23), her decision to reject Dr. Blaisdell's uncontroverted opinion and substitute her own interpretation of the medical evidence was improper.

The Commissioner also argues that any flaw in the ALJ's mental RFC assessment was harmless because "Dr. Blaisdell's more restrictive RFC assessment was consistent with the jobs that the VE testified were available in significant numbers." (Def. Mem. at 16). In particular, the Commissioner contends that "[a] limitation to simple tasks is consistent with the capacity for unskilled work[,]" and because all of the jobs recommended by the VE were unskilled in nature, the result would have been the same even if the ALJ had adopted Dr. Blaisdell's opinion. (<u>Id.</u> at 16-17).

This argument too is unpersuasive. It is true that each of the jobs that the VE identified carried an SVP level of 2, which corresponds to unskilled work. <u>See</u> <u>Ahearn v. Astrue</u>, No. 06-94-B-W, 2007 WL 951562, at *2 (D. Me. Mar. 27, 2007) (explaining that "SVP Levels 1 and 2 correspond to unskilled work"), <u>aff'd</u>, 2007 WL 1309557 (D. Me. May 2, 2007). However, unskilled work does not necessarily equate with a limitation to simple, 1-2 step tasks. <u>See</u> <u>Lucy v. Chater</u>, 113 F.3d 905, 909 (8th Cir. 1997) ("The Social Security's own list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions"); <u>Swift v. Astrue</u>, Civil No. 08-280-B-W., 2009 WL 902067, at *4 n.5 (D. Me. Mar. 31, 2009) ("in limiting the plaintiff to unskilled work, the administrative law judge cannot fairly have been said to have found him capable of understanding and remembering simple, repetitive

tasks and procedures or performing simple tasks for two-hour blocks of time"), aff'd, 2009 WL 1080722 (D. Me. Apr. 21, 2009); Hall v. Barnhart, No. 03-299-P-C., 2004 WL 1896969, at *3 (D. Me. Aug. 25, 2004) ("whether a job is skilled or unskilled does not speak directly to the question of whether it entails simple, repetitive tasks"). Accordingly, the record does not show that the ALJ's error was  harmless.  Thus, the matter should be remanded so that the ALJ can further address Dr. Blaisdell's opinion regarding Johnson's mental limitations.

### The Physical RFC Assessment

In addition to his challenge to the ALJ's mental RFC assessment, Johnson contends that the ALJ committed reversible error in connection with her assessment of the plaintiff's physical RFC.  Specifically, the plaintiff argues that the ALJ impermissibly relied on outdated opinions of two state agency physicians who completed RFC assess-ments prior to Johnson's neck surgeries and did not have access to the 2011 records regarding Johnson's cervical and lower back impairments.  (See Pl. Mot. at 11).  For the reasons that follow, this court finds that the ALJ's reliance on the opinions of the state agency physicians was proper.

As described above, two state agency physicians, Dr. Weeratne and Dr. Caraceni, provided written assessments of Johnson's physical RFC.  Dr. Weeratne completed a physical RFC form on June 22, 2009.  (Tr. 416-23).  Therein, Dr. Weeratne opined that the plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could stand, walk or sit about 6 hours in an 8-hour workday, and had no limits on his

ability to push and/or pull.  (Tr. 417).  Dr. Weeratne also opined that the plaintiff would

have frequent or occasional limitations in his ability to climb, balance, stoop, kneel,

crouch and crawl, and he recommended that the plaintiff avoid concentrated exposure to

heights and hazardous machinery, and that he be limited to occasional overhead reaching.

(Tr. 418-20).

　　　　Dr. Caraceni completed a physical RFC form for the plaintiff on March 3, 2009.

(Tr. 374-81).  Like Dr. Weeratne, Dr. Caraceni opined that Johnson could lift and/or

carry 20 pounds occasionally and 10 pounds frequently, could stand, walk or sit about 6

hours in an 8-hour workday, and had no limits on his ability to push and/or pull.  (Tr.

375).  She also recommended that Johnson avoid concentrated exposure to heights,

hazardous machinery and extreme cold, and that he be limited to occasional overhead

reaching.  (Tr. 377-78).  However, she found that the plaintiff's only postural limitations

consisted of occasional limitations in his ability to balance and crawl.  (Tr. 376).

　　　　Although the ALJ stated that she was giving "greatest weight" to the opinion of

Dr. Weeratne, and "some" weight to the opinion of Dr. Caraceni, it is clear that she did

not rely exclusively on the opinions of the state agency physicians.  Rather, as described

in her written opinion, the ALJ considered all of the available medical evidence in

rendering her assessment of Johnson's physical RFC, including the records of Johnson's

neck surgeries, records relating to Johnson's back pain, and 2011 records relating to his

most recent complaints of problems with his neck.  (See Dec. 14-17; Tr. 21-24).  For

example, although the ALJ explained that she was using Dr. Weeratne's assessment as a

"template" for the plaintiff's physical limitations, she explained that she was adding additional limitations in order "to give the claimant a benefit of the doubt and address his lumbar spine complaints which developed subsequent to Dr. Weeratne's evaluation." (Dec. 17; Tr. 24).   Moreover, the ALJ specifically considered restrictions that the plaintiff's surgeon, Dr. Eck, had placed on the plaintiff's activities as a result of his neck surgeries, but she concluded, based on Dr. Eck's own records, that the plaintiff's neck condition resolved after a period of recovery from his last surgery.   (See Dec. 15, 17; Tr. 22, 24).   Furthermore, the ALJ considered evidence from 2011 indicating that Johnson was having problems with his neck.   (Dec. 17; Tr. 24).   However, the ALJ found that Johnson's most recent complaints of neck pain were not credible in light of the lengthy gap in evidence relating to his neck pain after June 2010, and her determination that Johnson's complaints of pain and other symptoms lacked credibility.   (See Dec. 15-17; Tr. 22-24).

In assessing an individual's RFC, the ALJ "is entitled 'to piece together the relevant medical facts from the findings and opinions of multiple physicians.'"   Lacroix v. Barnhart, 352 F. Supp. 2d 100, 112 (D. Mass. 2005) (quoting Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987)).   Here, the ALJ committed no error by considering Dr. Weeratne's and Dr. Caraceni's RFC assessments in the context of the record as a whole, and by relying on those assessments, at least in part, to support her finding regarding Johnson's physical RFC.

### C.   Adequacy of the ALJ's Credibility Assessment

-29-

The plaintiff next argues that the ALJ's assessment of his credibility was not supported by substantial evidence because the ALJ improperly declined to credit medical evidence showing that Johnson's cervical impairment persisted after September 2010, and because she failed to assess the credibility of Johnson's subjective complaints of pain and other symptoms in light of the relevant factors set forth in the First Circuit's decision in Avery v. Sec'y of Health & Human Servs., 797 F.2d 19 (1st Cir. 1986).  (Pl. Mot. at 6-9). Generally, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  In the instant case, the ALJ made  extensive findings based on all of the medical evidence before her and in light of the relevant factors described in Avery.  Therefore, this court finds that her decision not to credit Johnson's complaints of pain and other symptoms was based on substantial evidence.

As described above, the ALJ determined that Johnson had "one of the lowest assessments of credibility [that she had] made in a case to date."  (Dec. 12; Tr. 19).  The ALJ provided support for this assessment with an extensive description of the evidence, including citations to the underlying record, which undermined Johnson's claim of disabling pain and other symptoms.  Such evidence revealed, among other things, that subsequent to the alleged onset date of his disability, Johnson participated in work-related activities, provided inconsistent reports concerning his alcohol use to his medical

providers, engaged in drug seeking behavior, and participated in sports and other physical activities that were entirely inconsistent with his claim of disability.  (See Dec. 12-15; Tr. 19-22).  Thus, the ALJ made numerous findings which supported her conclusion that Johnson lacked credibility.

### Findings Regarding Johnson's Cervical Impairment

Johnson argues that the ALJ's credibility determination was inadequate because she ignored evidence showing that during the relevant time period, the plaintiff suffered from persistent pain and associated functional limitations resulting from his cervical impairment.  (Pl. Mot. at 6-8).  In particular, Johnson takes issue with the ALJ's finding that the plaintiff's neck impairment had resolved by September 2010.  (Id. at 7).  He argues that this finding was inconsistent with medical records from Dr. Eck showing that Johnson continued to receive treatment for muscle spasms and neck pain in 2011.  (Id. at 7-8).

This court finds that the plaintiff's arguments regarding his neck impairment are insufficient to undermine the ALJ's credibility assessment.  As an initial matter, the ALJ's determination that Johnson's allegations of disabling symptoms lacked credibility was based on numerous facts from the evidentiary record, including evidence that Johnson worked as a mover and cab driver, engaged in drug seeking behavior, partici- pated in sports such as swimming and basketball, and even engaged in "cliff diving" during his alleged period of disability.  (See Dec. 12-15; Tr. 19-22).  This evidence alone

is sufficient to support the ALJ's conclusion that Johnson's claim as to the severity of his symptoms was not credible.

Furthermore, the ALJ specifically considered the medical records from Dr. Eck's office, and gave specific reasons for not crediting Johnson's allegations that he continued to suffer from disabling neck pain in 2011.  (See Dec. 13, 15-17; Tr. 20, 22-24).  As the ALJ observed, Dr. Eck met with the plaintiff on June 1, 2010, less than five months after his second neck surgery, and reported that Johnson had been weaned off of narcotics and was making good progress with respect to his treatment for his neck pain.  (Dec. 17; Tr. 24; see also Tr. 650).  The next visit with Dr. Eck occurred August 2010.  (Dec. 17; Tr. 24; see also Tr. 649).  During the August visit, Johnson complained of back pain in his lumbar spine, but reported no problems relating to his neck.  (Id.).  Based on that evidence, the ALJ concluded that Johnson's neck impairment had resolved by that time.  (See Dec. 17; Tr. 24).  The ALJ did acknowledge that Johnson met with Dr. Eck again in February 2011, and reported further problems with his neck.  (See id.; Tr. 707).  However, she explained that she could not credit Johnson's report of neck pain at that time due to the length of time that had elapsed with no complaints and the fact that prior records had shown a resolution of the plaintiff's neck impairment.  (Dec. 15-16; Tr. 22-23).  The ALJ also found that "given the claimant's poor credibility, an isolated period of time is inherently suspicious."  (Dec. 16; Tr. 23).  As detailed above, her conclusion was supported by specific facts and was therefore based on substantial evidence in the record.

The ALJ also noted that at the time Johnson reported a return of pain in his cervical spine in February 2011, the plaintiff engaged in apparent drug seeking behavior. Specifically, the record shows that on February 14, 2011, three days after his visit to Dr. Eck's office, Johnson contacted a nurse in Dr. Eck's office to report that his medications had been stolen. (Dec. 13; Tr. 20; see also Tr. 703). The medications had been prescribed three days earlier and included 80 tablets of oxycodone. (Id.). The nurse informed Johnson that he would not receive a prescription for more medication until he provided a police report validating the theft. (Id.). However, as the ALJ found, "[t]here is no evidence of subsequent records indicating the [plaintiff] submitted a police report." (Dec. 13; Tr. 20). Thus, the records from Dr. Eck's office provide support for the ALJ's decision not to credit Johnson's claim that he continued to experience disabling cervical pain and associated functional limitations in February 2011.

In sum, the ALJ did not ignore medical evidence relating to Johnson's cervical impairment and did not reject the evidence from Dr. Eck. Rather, she relied on Dr. Eck's records, as well as other available medical evidence, to reject Johnson's subjective complaints of pain and other symptoms.

## Application of the "Avery" Factors

This court also finds that the ALJ did not err by failing to apply the so-called "Avery factors" in deciding not to credit Johnson's complaints of disabling pain and other symptoms. Although the ALJ did not list those factors in her written decision, the record

shows that she considered them in connection with her assessment of Johnson's credibility.

"The [Social Security] regulations recognize that a person's symptoms may be more severe than the objective medical evidence suggests.  Therefore, the regulations provide six factors (known as the *Avery* factors) that will be considered when the applicant alleges pain" or other symptoms.  Makuch v. Halter, 170 F. Supp. 2d 117, 126 (D. Mass. 2001) (internal citation omitted).  These are:

> (1) the nature, location, onset, duration, frequency, radiation, and intensity of pain; (2) any precipitating or aggravating factors; (3) the type, dosage, effectiveness, and adverse side effects of any pain medication; (4) any treatment, other than medication, for the relief of pain; (5) any functional restrictions; and (6) the claimant's daily activities.

Rohrberg v. Apfel, 26 F. Supp. 2d 303, 308 (D. Mass. 1998) (citing Avery, 797 F.2d at 29).  While the ALJ must consider each of these factors, there is no requirement that she make specific findings regarding each of the factors in her written decision.  See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (listing Avery factors as factors that the Commissioner "will consider" in evaluating subjective complaints of pain and other symptoms).  See also Rand v. Barnhart, 357 F. Supp. 2d 361, 368 (D. Mass. 2005) ("While it may be argued that it would have been more helpful for the hearing officer explicitly to outline the *Avery* factors in making his credibility determination, it is sufficiently clear from the record that he thoroughly questioned [the claimant] according to those guidelines at the hearing").

Here, the ALJ fulfilled her obligation to consider the <u>Avery</u> factors.  In her written decision, the ALJ expressly addressed the plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms.  For example, but without limitation, the ALJ acknowledged the plaintiff's claim that since the alleged onset date of his disability in January 2008, he has suffered chronic, and at times "completely debilitating," pain in his neck, which radiates into his shoulders and arms, causes him to experience problems with balance and dexterity, and severely limits his ability to perform activities of daily living.  (Dec. 5-7; Tr. 12-14).  She also acknowledged Johnson's claim that he has suffered from lower back pain with associated pain and numbness in his leg, as well as his claim that due to his mental impairments, he has experienced anger management issues, sleep deprivation, mood swings, and long-term problems with concentration and focus.  (Dec. 5, 7-8, 10, 16; Tr. 12, 14-15, 17, 23).  However, as described above, the ALJ found that Johnson's allegations were undermined by evidence regarding his physical activities, work activities, drug seeking behavior, and inconsistent reporting to his medical providers.  Accordingly, she declined to credit the plaintiff's statements.

With respect to treatment, the ALJ considered evidence regarding Johnson's two surgeries for his cervical impairment in December 2009 and January 2010.  (Dec. 6-7; Tr. 13-14).  She also considered the fact that Johnson relied primarily on Percocet and other narcotics to manage his pain throughout much of the relevant period.  (Dec. 12; Tr. 19).  The ALJ noted, however, that by June 1, 2010, the plaintiff was no longer on narcotics and was found to have "only very local area point tenderness to palpation along his

trapezial area[.]" (Dec. 7; Tr. 14).  Moreover, she noted that an MRI taken of Johnson's

cervical spine on August 8, 2010 detected no evidence of complications from his surgery.

(Id.).  With respect to Johnson's mental impairments, the ALJ considered evidence that

the plaintiff's mood was helped by engaging in sports.  (Dec. 8; Tr. 15).  Additionally,

the ALJ noted that during a visit with a nurse in February 2011, the plaintiff reported that

he was able to manage his depression by taking Xanax and obtaining counseling.  (Dec.

16; Tr. 23).  Nevertheless, the ALJ credited evidence indicating that Johnson continued to

experience problems with distraction, focus and mood swings.  (Id.).

Finally, the ALJ considered Johnson's allegations regarding his functional

limitations, including limitations on his ability to perform activities of daily living (see

Dec. 5, 8-9; Tr. 12, 15-16), but she determined that those allegations were entirely

inconsistent with evidence showing that Johnson was capable of engaging in such

activities as jumping off a 30-foot cliff, operating a jet ski, and driving a 4-wheel off-road

vehicle.  (Dec. 14; Tr. 21).  Therefore, the record demonstrates that the ALJ considered

the relevant factors in deciding not to credit Johnson's complaints of disabling pain and

other symptoms.

### D. Reliability of the VE's Testimony

Finally, the plaintiff contends that the ALJ erred by relying on the VE's testimony

because that testimony was based on a hypothetical question that did not accurately

convey Johnson's mental and physical limitations, and because the VE failed to resolve

the inconsistencies between her testimony and the DOT or to produce copies of the labor

market surveys on which she relied to support her opinions.  (Pl. Mot. at 10-14; Pl. Reply Mem. (Docket No. 19) at 2-7).  For the reasons that follow, this court agrees that the hypothetical question was flawed because it did not accurately reflect Johnson's mental limitations.  However, this court finds that Johnson's remaining claims of error lack merit.

## Plaintiff's Challenge to the Hypothetical Question

At step five in the analytical process, the Commissioner must provide evidence that the claimant can still perform work that exists in significant numbers in the national economy.  See Seavey, 276 F.3d at 5.  "The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis."  Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011).  "In order to be substantial evidence, however, the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations."  Id.

In the instant case, the ALJ relied on the VE's response to a hypothetical question which incorporated the limitations described in the ALJ's finding as to Johnson's RFC. The plaintiff argues that because the ALJ's RFC assessment did not accurately reflect the medical evidence regarding his mental impairments, and was based on the outdated opinions of Drs. Weeratne and Caraceni, the VE's response to the hypothetical question was unreliable.  (Pl. Mot. at 10-11).  For the reasons described above, this court finds that the ALJ did not err by relying on the opinions of the state agency physicians in assessing Johnson's physical RFC.  However, because the ALJ erred when she concluded that

Johnson had the mental capacity to handle detailed instructions and occasionally handle complex instructions, the VE's testimony that a claimant having those abilities could perform work as an information clerk, desk attendant security guard, and inspector was not based on substantial evidence and warrants a remand to the ALJ.

The plaintiff further asserts that the hypothetical question was flawed because it mischaracterized the ALJ's finding that the plaintiff could only concentrate for two hours at a time before needing a break.  (Id. at 11-12).  Specifically, as part of her hypothetical question, the ALJ described a claimant who could "concentrate up to two hours at a time before needing a *normal* break."  (See Tr. 77 (emphasis added)).  The plaintiff argues that "the 2-hour limitation is not accounted for by 'normal breaks'" but rather "constitutes a significant functional restriction which the VE failed to address in her testimony."  (Pl. Mot. at 12).  Thus, he contends that the ALJ's insertion of the word "normal" in her hypothetical question somehow deprived the VE of an opportunity to consider the 2-hour limitation on the plaintiff's ability to concentrate.  (See id.).

This court is not convinced that the ALJ's insertion of the word "normal" in her hypothetical question failed to convey the fact that Johnson would be able to concentrate for only two hours at a time before needing a break.  The ALJ specifically instructed the VE that the hypothetical claimant would have a 2-hour restriction on his ability to con-centrate.  Her insertion of the word "normal" did not substantively alter that instruction or deprive the VE of an opportunity to consider the 2-hour limitation on the claimant's ability to concentrate.

-38-

In any event, there is no merit to the plaintiff's argument that a 2-hour time limitation constitutes a significant functional restriction which the VE was required to address in her testimony. "The Social Security Administration's Program Operation Manual explains 'that the mental abilities needed for any job include the ability to understand, remember, and carry out simple instructions by, . . . maintaining concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure).'" McGrath v. Astrue, Civil No. 10-cv-455-JL, 2012 WL 976026, at *6 (D.N.H. Mar. 22, 2012) (unpub. op.) (quoting Baker v. Comm'r Soc. Sec. Admin., No. 1:10-cv-00167-JAW, 2011 WL 1298694, at *4 (D. Me. Mar. 31, 2011)). Consequently, courts have recognized that an "assessment of a capacity for concentration in two-hour blocks merely indicates that a claimant crosses the threshold for having a residual functional capacity for unskilled work[.]" Id. (quoting Baker, 2011 WL 1298694, at *6). Nothing about the circumstances of this case suggests that the ALJ's 2-hour block limitation was anything more than an indication that Johnson retained the mental capacity to perform unskilled work. See Baker, 2011 WL 1298694, at *6 (describing 2-hour block limitation as "an innocuous, internal claims-processing guideline" which does not amount to a medical finding which is required to be "explained away by the Judge if it is not incorporated into an RFC finding"). Thus, the VE had no obligation to address it directly.

## Inconsistency with the DOT

There is no dispute that the VE's testimony was inconsistent with the DOT.  (See Tr. 81).  While the VE conceded that the jobs of an information clerk, desk attendant security guard and inspector require frequent reaching under the DOT, she testified that the DOT does not describe those positions as they are performed today.  (Id.).  She further testified that a claimant with the plaintiff's limitations, who could perform only occasional overhead reaching, and could not perform overhead lifting of anything over 5 pounds, would remain capable of performing those jobs as they currently exist.[5]  (See Tr. 81-82).  The plaintiff argues that the ALJ's decision must be reversed and remanded because the VE did not provide an adequate explanation for the discrepancy between her testimony and the DOT, and the ALJ failed to adequately address the conflict.  (See Pl. Mot. at 13-14; Pl. Reply Mem. at 6-7).  This court disagrees for the reasons that follow.

The Social Security Administration has issued a ruling addressing situations in which a VE's testimony conflicts with the occupational information set forth in the DOT. Specifically, Social Security Ruling ("SSR") 00-4p provides in relevant part:

---

[5]  The plaintiff argues that there also was a conflict between the VE's testimony and the DOT because the jobs which the VE identified require a reasoning level beyond the level of an individual who is limited to simple tasks.  (See Pl. Reply Mem. at 7).  However, as described above, the ALJ did not limit the hypothetical claimant to simple tasks. Rather, she stated that the hypothetical claimant would have the capacity to "perform simple and detailed instructions, but only occasionally complex instructions."  (Tr. 77).  Although this court finds that these limitations were not supported by the medical evidence in the record, the record does not establish any discrepancy between the DOT and the VE's testimony that a claimant with the ability to perform simple and detailed instructions, but only occasionally complex instructions, would be able to perform the work of an information clerk, a desk attendant security guard or an inspector.

> Occupational evidence provided by a VE or VS generally should be
> consistent with the occupational information supplied by the DOT.
> When there is an apparent unresolved conflict between VE or VS
> evidence and the DOT, the adjudicator must elicit a reasonable
> explanation for the conflict before relying on the VE or VS evidence
> to support a determination or decision about whether the claimant is
> disabled.  At the hearings level, as part of the adjudicator's duty to
> fully develop the record, the adjudicator will inquire, on the record,
> as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps"
> when there is a conflict.  The adjudicator must resolve the conflict
> by determining if the explanation given by the VE or VS is
> reasonable and provides a basis for relying on the VE or VS
> testimony rather than on the DOT information.

SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).  Accordingly, the ALJ is

authorized to rely on VE testimony that conflicts with the DOT as long as the ALJ

determines that the VE's explanation for the conflict is reasonable and provides the basis

for accepting the VE's testimony.

    SSR 00-4p offers guidance as to what constitutes a reasonable explanation for a

conflict between a VE's testimony and the DOT.  As the Ruling explains:

> Reasonable explanations for such conflicts, which may provide a
> basis for relying on the evidence from the VE or VS, rather than the
> DOT information, include, but are not limited to the following:
> Evidence from the VEs or VSs can include information not listed in
> the DOT.  The DOT contains information about most, but not all,
> occupations.  The DOT's occupational definitions are the result of
> comprehensive studies of how similar jobs are performed in different
> workplaces.  The term "occupation," as used in the DOT, refers to
> the collective description of those jobs.  Each occupation represents
> numerous jobs.  <u>Information about a particular job's requirements or
> about occupations not listed in the DOT may be available in other
> reliable publications, information obtained directly from employers,</u>

-41-

> or from a VE's or VS's experience in job placement or career
> counseling.
>
> The DOT lists maximum requirements of occupations as generally
> performed, not the range of requirements of a particular job as it is
> performed in specific settings.  A VE, VS, or other reliable source of
> occupational information may be able to provide more specific
> information about jobs or occupations than the DOT.

Id. at *2-3 (emphasis added).

Finally, the Ruling requires the ALJ to explain how she resolved the conflict in her

written decision as follows:

> When vocational evidence provided by a VE or VS is not consistent
> with information in the DOT, the adjudicator must resolve this
> conflict before relying on the VE or VS evidence to support a
> determination or decision that the individual is or is not disabled.
> The adjudicator will explain in the determination or decision how he
> or she resolved the conflict.  The adjudicator must explain the
> resolution of the conflict irrespective of how the conflict was
> identified.

Id. at *4.

In the instant case, the VE provided a reasonable explanation for the conflict

between her testimony and the information contained in the DOT.  In particular, she

explained that the DOT, which was written approximately nine years prior to the date of

the hearing, does not accurately describe the jobs of an information clerk, desk attendant

security guard or inspector as they are currently performed in the workplace today.  (Tr.

81).  She further explained that her identification of jobs which the hypothetical claimant

could perform was based on labor market research, as well as on her own observations

about the particular jobs she had listed.  (Tr. 81-82).  Moreover, the VE testified that she

was personally familiar with the reaching requirements of each occupation because she had conducted labor market surveys on each of the three jobs at issue. (Tr. 82, 89). Thus, the VE based her testimony on job market information that she had gathered as part of her work in the vocational field. Under SSR 00-4p, there was an acceptable basis for the ALJ's decision to rely on that testimony.

This court also finds that the ALJ sufficiently explained in her written decision why she was relying on the VE's testimony despite the conflict between the testimony and the DOT. Notably, the ALJ found that the VE had relied on both her labor market surveys and her personal experience of placing people in positions in the labor market to support her opinions. (Dec. 20; Tr. 27). The ALJ also emphasized that the VE was an impartial witness who was questioned extensively about her experience in the vocational field and established that she was qualified to testify as an expert. (Id.). Moreover, the ALJ determined that the DOT does not distinguish between different types of reaching that are required for each job, and she concluded that it was reasonable for the VE to rely on "her professional experience in identifying jobs that do not require the type of lifting and/or reaching precluded by the assessed [RFC]." (Dec. 21; Tr. 28). Accordingly, the ALJ complied with the requirements of SSR 00-4p, and her decision to rely on the VE's testimony did not constitute reversible error.

## Failure to Produce Labor Market Studies

Johnson nevertheless argues that the VE's refusal to produce the labor market surveys on which she relied to support her opinion deprived him of an opportunity to test the basis for her testimony.  (Pl. Mot. at 14).  He also contends that "the ALJ's failure to require the VE to produce her records constitutes a separate basis for reversal and remand."  (Pl. Reply Mem. at 7).  Again this court disagrees.

In support of his assertion that the VE should have produced her labor market surveys, Johnson relies on case law from courts in the Seventh Circuit.[6]   Under the law of that Circuit, a VE is required to "make his or her data 'available on demand' if it is challenged."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 449 (2d Cir. 2012) (quoting McKinnie v. Barnhart, 368 F.3d 907, 911 (7th Cir. 2004)).  However, this rule "has not been a popular export[,]" and it appears that no court outside the Seventh Circuit has agreed with it.  Id.  See also Babb v. Astrue, No. 2:10-cv-49-DBH, 2010 WL 5465839, at *4 (D. Me. Dec. 29, 2010) (rejecting plaintiff's assertion that the VE's opinion was not reliable "because he did not bring to the hearing the records upon which he relied in reaching his conclusions," and citing cases in which courts have rejected such an argument), adopted by 2011 WL 672438 (D. Me. Feb. 16, 2011).  Moreover, "[i]n

---

[6]  Specifically, Johnson relies on cases from the Seventh Circuit Court of Appeals, as well as cases from the Eastern District and Western District of Wisconsin, to support his argument that the VE was obligated to produce her underlying labor market surveys.  Although Johnson also has cited to one case from the Western District of Tennessee, which is outside the Seventh Circuit, that case did not address the issue whether a VE is required to produce evidence in support of his or her testimony.  See Lenon v. Apfel, 191 F. Supp. 2d 968 (W.D. Tenn. 2001).

contrast to the Seventh Circuit's approach, other courts have held that '[a] VE's recognized expertise provides the necessary foundation for his or her testimony.  Thus, no additional foundation is required.'"  <u>Pritchett v. Astrue</u>, No. 5:09-CV-144 (CAR), 2009 WL 4730326, at *3 (M.D. Ga. Dec. 4, 2009) (quoting <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005)).  <u>See</u> <u>also</u> <u>Jones v. Apfel</u>, 190 F.3d 1224, 1230 (11th Cir. 1999) (finding testimony of VE reliable where VE testified that he obtained his information from "a personal survey, contact with employers and other VEs and a survey of literature such as census reports and county business patterns").  This court finds that in the absence of a regulation or other binding authority requiring VEs to provide supporting documentation, the VE's refusal to do so in this case does not provide a basis for a remand.  Accordingly, the ALJ did not err by relying on the VE's expertise without requiring the VE to produce the labor market surveys supporting her opinions.

## IV.  <u>CONCLUSION</u>

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the "Defendant's Motion to Affirm the Commissioner's Decision" (Docket No. 14) be DENIED, that the "Plaintiff's Motion to Reverse" (Docket

No. 12) be ALLOWED, and that the matter be remanded to the ALJ for further

proceedings[7] consistent with this Report and Recommendation.[8]

                     / s / Judith Gail Dein                     
                     Judith Gail Dein
                     United States Magistrate Judge

---

[7]  This court expresses no opinion as to the appropriate outcome of additional administrative proceedings.

[8]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).